Andrea McCALEB, et al., Plaintiffs,

v.

PIZZA HUT OF AMERICA, INC.,
a Delaware corporation,
Defendant.

No. 97 C 4703.

United States District Court,
N.D. Illinois,
Eastern Division.

July 31, 1998.

**1044**

Edward A. Voci, Chicago, IL, for Plaintiffs.

James D. Fiffer, Rohit Sahgal, Wildman, Harrold, Allen & Dixon, James D. Montgomery, Paul R. Borth, James D. Montgomery & Assoc., Ltd., Chicago, IL, for Defendant.

### MEMORANDUM OPINION AND ORDER

HART, District Judge.

Plaintiffs in this action are members of an extended family of African–Americans. They allege that they were treated discriminatorily when they attempted to dine in at a restaurant of defendant Pizza Hut of America, Inc. Plaintiffs complain that Pizza Hut did not want to allow them to dine at the restaurant, that they were harassed while dining in, and that they were further harassed and threatened when leaving the restaurant. Count I is based on racially discriminatory interference with the right to contract in violation of 42 U.S.C. § 1981. Count II is a supplemental state law claim for civil damages under the Illinois Hate Crimes Act, 720 ILCS 5/12–7.1(c). Defendant has moved for summary judgment.

On a motion for summary judgment, the entire record is considered with all reasonable inferences drawn in favor of the non-movants and all factual disputes resolved in favor of the nonmovants. *Valance v. Wisel,* 110 F.3d 1269, 1274 (7th Cir.1997); *Patel v. Allstate Insurance Co.,* 105 F.3d 365, 367 (7th Cir.1997). The burden of establishing a lack of any genuine issue of material fact rests on the movant. *Essex v. United Parcel Service, Inc.,* 111 F.3d 1304, 1308 (7th Cir. 1997). The nonmovants, however, must make a showing sufficient to establish any essential element for which they will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Wintz v. Northrop Corp.,* 110 F.3d 508, 512 (7th Cir.1997). The movant need not provide affidavits or deposition testimony showing the nonexistence of such essential elements. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. Also, it is not sufficient to show evidence of purportedly disputed facts if those facts are not plausible in light of the entire record. *See NLFC, Inc. v. Devcom Mid–America, Inc.,* 45 F.3d 231, 236 (7th Cir.), *cert. denied,* 515 U.S. 1104, 115 S.Ct. 2249, 132 L.Ed.2d 257 (1995); *Covalt v. Carey Canada, Inc.,* 950 F.2d 481, 485 (7th Cir.1991); *Collins v. Associated Pathologists, Ltd.,* 844 F.2d 473, 476–77 (7th Cir.), *cert. denied,* 488 U.S. 852, 109 S.Ct. 137, 102

L.Ed.2d 110 (1988). As the Seventh Circuit has summarized:

> The moving party bears the initial burden of directing the district court to the determinative issues and the available evidence that pertains to each. "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *id.* at 325, 106 S.Ct. 2548 ("the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case"). Then, with respect to issues that the non-moving party will bear the burden of proving at trial, the non-moving party must come forward with affidavits, depositions, answers to interrogatories or admissions and designate specific facts which establish that there is a genuine issue for trial. *Id.* at 324, 106 S.Ct. 2548. The non-moving party cannot rest on the pleadings alone, but must designate specific facts in affidavits, depositions, answers to interrogatories or admissions that establish that there is a genuine triable issue. *Id.* The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

*Selan v. Kiley,* 969 F.2d 560, 564 (7th Cir. 1992).

Construing the facts in this manner, the facts assumed true for purposes of summary judgment are as follows.[1] Plaintiffs were in Illinois for a family reunion. They are all African–Americans. The adult plaintiffs are Philander McCaleb and Andrea McCaleb, husband and wife; Adrian Burton ("Adrian Sr.") and Pamela Burton, husband and wife; Stephanie Burton; and Mary Ann Burton. Mary Ann Burton is the mother of Andrea McCaleb and Adrian Burton. The minor plaintiffs on behalf of whom claims have been brought are Aaron Burton, Andre Burton, and A'Ishia Johnson, children of Andrea McCaleb; A'India McCaleb, A'Kenya McCaleb, and A'Ziuria McCaleb, children of Andrea and Philander McCaleb; Rhyan Burton (a.k.a. Rhyan Burham), child of Stephanie Burton; Adrian Burton, Jr., child of Adrian Burton; Aurelia McRoy, child of Pamela Burton; and Judia Burton, child of Mary Ann Burton. Special administrators bring claims on behalf of the heirs of two family members who are now deceased, Willie Burton, Jr. and Judia Lacey. Willie Burton, Jr. is the late husband of Mary Ann Burton and Judia Lacey is the late mother of Mary Ann Burton.[2]

At the time this action was filed, plaintiffs were residents of (or decedents who had last resided in) Texas, South Carolina, and Illinois. Defendant is a Delaware corporation. There is no allegation as to defendant's principal place of business, but one case has been

---

**1.** Defendant complains that plaintiffs' brief contains no citations to the record. Plaintiffs' Local Rule 12(N) Statement, however, contains adequate citations to the record and is well organized. It might have been more convenient if plaintiffs' brief had cited to paragraphs of their 12(N) Statement. Nevertheless, there was no difficulty in finding support for plaintiffs' factual assertions and, contrary to defendant's urging, the clear references to the record in the 12(N) Statement will not be ignored. Inappropriate was defendant's response to plaintiffs' 12(N) Statement in which defendant repeatedly denies adequately supported facts contained in plaintiffs' Rule 12(N) Statement. But, generally, all that defendant points to is contrary evidence, not an absence of supporting evidence of plaintiffs. For purposes of summary judgment, all such factual disputes must be resolved in favor of plaintiffs, the nonmovants.

**2.** Because various family members have the same surname, plaintiffs will generally be referred to by their first names.

found which identifies defendant's principal place of business as being in Kansas. *See Thompson v. Pizza Hut of America, Inc.*, 767 F.Supp. 916, 917 (N.D.Ill.1991). But even assuming there is complete diversity of citizenship, the complaint contains no allegation as to the amount of damages any plaintiff is claiming on Count II. The complaint expressly relies upon supplemental jurisdiction, *see* 28 U.S.C. § 1367, and there is no express reliance on diversity jurisdiction. It is assumed that the state law claims are before the court on supplemental jurisdiction only.

On Sunday night, July 2, 1995, between 9:30 and 10:00 p.m., Mary Ann Burton telephoned the Pizza Hut in Godfrey, Illinois and ordered six pizzas. Mary Ann lived in the area and was a regular customer of the restaurant, for both carry out and dining in. Mary Ann specifically asked if it was too late to dine in and the employee of Pizza Hut, after checking with someone else, said she could still dine in. The pizzas were ordered for dining in and a Pizza Hut employee called back to confirm the order.[3]

The employees on duty at the Godfrey Pizza Hut that night were Shift Manager Eric Jockish and crew members Jeremy Davis, Kelly Ollenbittle, Dave Ponce, and Rebecca Keiser. All these employees are white. The restaurant's scheduled closing time that night was 11:00 p.m. As of July 1995, the usual business practice of the restaurant was to take orders up until the closing time and permit dine-in customers to stay until they finished their meals.

Around 10:15 p.m., Andrea McCaleb was the first member of the family to walk into the restaurant. Other relatives were behind her. As she walked to a table, a Pizza Hut employee said, "I am not serving those niggers." Andrea sat down at a set of tables and other family members followed her to the tables. Employees, however, began taking those tables down. Upon inquiry, Ponce told them it was okay to use some other tables. It was evident to Ponce that plaintiffs intended to dine in. Adrian Sr. inquired

and was told by Ponce that the pizzas were not yet ready, but would be ready in a few minutes. When Adrian Sr. inquired again in five minutes, Ponce told him the pizzas were ready and pointed to six boxes on the counter. The boxes had not been there earlier. Adrian Sr. looked at the boxes and stated the pizzas had been ordered for dining in. Ponce did not respond. Adrian Sr. picked up the boxes and he and Andrea took them to the tables. Adrian then paid for the pizzas, which was approximately 10:23 p.m.

At the time the first plaintiffs arrived, the only other customers in the restaurant were a group of four whites, two adults and two children. That group left after about 15 minutes. No further dine-in customers came in after that. The white customers had plates and silverware with which to eat and they were served drinks after plaintiffs had arrived.

Andrea had heard the comment about not serving "niggers" and Adrian Sr. had heard the phrase "those niggers." Some of the adults discussed whether they should just leave, but initially decided to stay and eat.

Plaintiffs were not provided any plates, utensils, or napkins. No one seated them and no one waited on them to ask them if they needed any plates or utensils or to ask if they wanted drinks or anything else with their pizza. Adrian Sr. went to the counter and asked for plates, napkins, and/or silverware. Ponce handed him a stack of napkins. Adrian Sr. did not say anything further about plates or silverware.

After the white customers left, an employee began vacuuming around and under the tables at which plaintiffs were dining. When Adrian Sr. complained, she continued to vacuum around the table for a little while, then moved away a bit. Then, for a few minutes, the employee left the vacuum standing still in an upright position with the motor running. After the vacuuming stopped, the jukebox in the restaurant was turned on at an extremely loud volume. Then the volume was alternately turned up and down. When the loud

---

**3.** The printed receipt for the pizza is designated "carry out" and the cash register printed 10:23 p.m. On the motion for summary judgment, Burton's testimony that she ordered for dine in must be accepted as true and it must also be assumed that the receipt was printed when a member of the family paid for the pizza, not when the order was phoned in.

music stopped, the lights were turned on and off a number of times. The lights were left off for up to 15 or 20 seconds at a time. When plaintiffs complained about the lights, this antic stopped.

Shortly after the white customers had received drinks, Andrea went to the counter to order drinks and was told that no drinks could be provided because the machine had been turned off. Thereafter, no other customers received drinks, but there were also no other customers who requested drinks. Since the white customers had just received drinks and in light of the general refusal to provide adequate service to plaintiffs, on summary judgment it must be inferred that drinks could have been provided and defendant's employees instead intentionally refused to provide drinks.

Plaintiffs were in the restaurant until approximately 11:00 p.m. Judia Lacey and Mary Ann arrived shortly after the pizza was taken to the table. Willie and Stephanie arrived about 15 minutes after the others began eating but stayed only five to ten minutes. Willie departed so quickly because he perceived that he and his family were being mistreated because of their race. When the other plaintiffs decided to leave, they packed the remaining pizza themselves. At one point, Ponce told Adrian Sr. it was time for him to leave. Otherwise, plaintiffs were never expressly told they had to leave the restaurant. The treatment plaintiffs received, however, was a clear message that they were not welcome in the restaurant. At least some of the plaintiffs would have stayed longer and eaten more of their pizza at the restaurant if not for the treatment they were receiving. Most, if not all, of the adults were upset by the treatment they received and some of the children became frightened and cried.

Upon departing, confrontations occurred in the restaurant's parking lot. While plaintiffs were in the parking lot, one of the female employees yelled at them something to the effect: get out of here "niggers." One of the female employees came up to Andrea, who was seated in her car with her children, and called her a "black bitch." Andrea felt threatened and feared that the employee might hit her or that she might have something with which to hit her. Andrea got out of her car and chased the female employee away. Andrea was also fearful because Ponce and another male employee were standing behind her car, one with a bucket and one with a stick, which may have been the handle of a mop. The stick was being slapped into the employee's hand in a threatening manner. These same two also approached Adrian Sr. and stated something to the effect of: now you're going to get it. They, however, were distracted and did not follow through on the threat. Adrian Sr. also saw Ponce throw something that just missed his face, though it might have only been a napkin.

Eventually, one of the employees said he would call the police and Adrian Sr. said, "Please do." Plaintiffs waited around for fifteen minutes, but left before the police arrived. The police did meet them at a gas station about a half mile from the restaurant. The police did not arrest anyone.

Section 1981 provides:

(a) All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

(b) For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

(c) The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

Defendant contends that plaintiffs' § 1981 claims fail because they were not denied the right to contract in that they were provided their pizza and permitted to eat it

at the restaurant. Defendant ignores that § 1981(b) defines the making and enforcement of contracts as including performance of the contract and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. Here, defendant failed to provide plaintiffs the full benefits of the contract in that they failed to provide them with the proper utensils with which to eat their pizza and created a disturbing atmosphere in which to eat. Also, defendant refused to make a contract with plaintiffs in that defendant refused to sell them drinks that they expressed an interest in purchasing. Additionally, defendant interfered with the full enjoyment of the contract by driving plaintiffs out before they had completed eating all that they had intended to eat. Given the derogatory references to plaintiffs' race both when they arrived and when they left, as well as the more favorable treatment accorded the whites that were dining in at the restaurant, it can be inferred that the treatment received by plaintiffs was racially motivated.

The cases relied upon by defendant are distinguishable. In *Morris v. Office Max, Inc.*, 89 F.3d 411 (7th Cir.1996), police were called to a retail store to question plaintiffs as potential thieves, but plaintiffs were not precluded from either entering the store or purchasing items. That is unlike the present case where defendant refused to sell drinks to plaintiffs and provided them with less than the full value of their purchase, that is plaintiffs were denied the accoutrements that are ordinarily provided with a restaurant meal at the Godfrey Pizza Hut. In *Robertson v. Burger King, Inc.*, 848 F.Supp. 78, 80–81 (E.D.La.1994), white people were served food ahead of the black plaintiff. It was held that a delay in service, unlike a denial of service, does not constitute a § 1981 violation. Unlike the present case, Robertson was provided with the full value of his purchase and was not prevented from purchasing any items he wanted. Like *Robertson, Harrison v. Denny's Restaurant, Inc.*, 1997 WL 227963 (N.D.Cal. April 24, 1997), only involved a delay in restaurant service. In *Flowers v. TJX Cos.*, 1994 WL 382515 (N.D.N.Y. July 15, 1994), the plaintiffs were asked to leave the retail store, but only after they had completed their purchase. Again, unlike the present case, the *Flowers* plaintiffs were not denied the opportunity to purchase any items and were not provided with less than what they paid for.

Instead, the present case is more like those where the plaintiffs were denied the opportunity to purchase services, *see, e.g., Watson v. Fraternal Order of Eagles*, 915 F.2d 235, 243 (6th Cir.1990) (under more restrictive pre–1991 law, refusal to sell soft drinks to guests at club violated § 1981), or were denied the full services that they had paid for, *Perry v. Burger King Corp.*, 924 F.Supp. 548, 551–52 (S.D.N.Y.1996) (restaurant provided plaintiff the food he purchased, but refused to let him use the bathroom that is ordinarily available to customers). *Compare also Jackson v. Tyler's Dad's Place, Inc.*, 850 F.Supp. 53, 55–56 (D.D.C.1994), *aff'd by unpublished order*, 107 F.3d 923 (D.C.Cir.1996) (indicating that refusal to serve plaintiffs in the main dining room instead of the bar would constitute a § 1981 violation if the refusal had been racially motivated). The Count I § 1981 claim will not be dismissed.

As of 1995, the Illinois Hate Crimes Act provided:

> A person commits hate crime when, by reason of the actual or perceived race, color, creed, religion, ancestry, gender, sexual orientation, physical or mental disability, or national origin of another individual or group of individuals, he commits assault, battery, aggravated assault, misdemeanor theft, criminal trespass to residence, misdemeanor criminal damage to property, criminal trespass to vehicle, criminal trespass to real property, mob action or disorderly conduct as these crimes are defined in Sections 12–1, 12–2, 12–3, 16–1, 19–4, 21–1, 21–2, 21–3, 25–1, and 26–1 of this Code, respectively, or harassment by telephone as defined in Section 1–1 of the Obscene Phone Call Act.

720 ILCS 5/12–7.1(a) (1995).

The civil remedy provision provides: "Independent of any criminal prosecution or the result thereof, any person suffering injury to his person or damage to his property as a

result of hate crime may bring a civil action for damages, injunction or other appropriate relief." *Id.* § 12–7.1(c).

■ Defendant argues that it cannot be liable under the Hate Crimes Act because that Act only applies to natural persons. Defendant's argument is contrary to Illinois law regarding statutory construction. The Illinois General Assembly has promulgated rules of statutory construction, *see* 5 ILCS 70, that are to be applied "unless such construction would be inconsistent with the manifest intent of the General Assembly or repugnant to the context of the statute." 5 ILCS 70/1. One of the rules provides: " 'Person' or 'persons' as well as all words referring to or importing persons, may extend and be applied to bodies politic and corporate as well as individuals." 5 ILCS 70/1.05. When the word "person" is used in a statute, it is construed as applying to corporations and bodies politic as well unless the context, language, or legislative history indicates otherwise. *See Real v. Kim*, 112 Ill. App.3d 427, 68 Ill.Dec. 139, 445 N.E.2d 783, 790 (1st Dist.1983); *Atchison, Topeka & Santa Fe Ry. Co. v. Stamp*, 290 Ill. 428, 125 N.E. 381, 384 (1919); *Healy v. Heidelberg Garden Co.*, 233 Ill. 290, 84 N.E. 230, 233 (1908). *Compare Board of Education of City of Chicago v. A, C and S, Inc.*, 131 Ill.2d 428, 137 Ill.Dec. 635, 546 N.E.2d 580, 598 (1989) (where statute uses the term "natural person," that term does not include a body politic). Nothing in the statute indicates that "person," as used in § 12–7.1(a), should be limited to natural persons and defendant does not point to any legislative history indicating such a construction was intended. Moreover, subsection (c) does not use the term person nor expressly limit liability to the person who directly committed the hate crime. The employees of defendant who allegedly committed the hate crime were natural persons and there is nothing in subsection

(c) that precludes applying ordinary *respondeat superior* liability rules to defendant.[4]

■ On the facts assumed to be true for purposes of summary judgment, the evidence supports that defendant's employees committed assault and disorderly conduct and that such conduct was racially motivated. Plaintiffs have presented adequate evidence of the commission of a hate crime.[5]

■ Last, defendant contends that the Hate Crimes claim is preempted by the Illinois Human Rights Act ("IHRA") which provides: "[e]xcept as otherwise provided by law, no court of this state shall have jurisdiction over the subject of an alleged civil rights violation other that as set forth in" the IHRA. 775 ILCS 5/8–111(C). A recent Illinois Supreme Court decision makes clear that such preemption is limited to situations where the claim made is dependent on a legal duty imposed by the IHRA. Where the claim exists independent of any legal duty of the IHRA, the claim is not preempted. *Maksimovic v. Tsogalis*, 177 Ill.2d 511, 227 Ill.Dec. 98, 687 N.E.2d 21, 23–24 (1997). Preemption does not apply where two claims are merely factually linked; instead the *legal* bases for the claims must be inextricably linked. *See Heno v. Sprint/United Management Co.*, 1998 WL 341816 *2 (N.D.Ill. June 15, 1998). Here, there is an independent legal basis for the claim, which is the Hate Crimes Act itself. Therefore the claim is not preempted.

*Guy v. State of Illinois*, 958 F.Supp. 1300, 1312 (N.D.Ill.1997), holds that a Hate Crime claim is preempted by the IHRA. *Guy*, however, was decided before the Illinois Supreme Court decision in *Maksimovic*. *Guy*, 958 F.Supp. at 1312, holds that the IHRA "preempts state law tort claims if the underlying facts are 'inextricably linked' to civil rights violations listed in the IHRA." *Guy* further states:

---

4. In *Abdoh v. City of Chicago*, 930 F.Supp. 311, 313 (N.D.Ill.1996), the court denied dismissal of a Hate Crime claim against the City of Chicago and one of its police officers. The opinion, however, does not expressly discuss whether, as a body politic, the City of Chicago was a type of entity to which the statute applies.

5. Defendant does not make any argument regarding which plaintiffs were actually present in the parking lot during the pertinent time, who was assaulted, or who were the victims of any disorderly conduct. Therefore, it must presently be assumed that all plaintiffs have a Hate Crime claim. In the final pretrial order, however, plaintiffs must specifically identify which plaintiffs are claiming to be victims of the hate crime.

Recently, the Illinois appellate court discussed the panoply of district court cases on the subject and found that intentional torts, such as intentional infliction of emotional distress, are preempted by the IHRA where the underlying facts which support them are the same facts as underlie a plaintiff's sexual harassment claims. *Maksimovic v. Tsogalis,* 668 N.E.2d 166, 172–73, 282 Ill.App.3d 576, 585–86, 218 Ill. Dec. 3, 9–10 (Ill.App.Ct.1996).

*Guy,* 958 F.Supp. at 1312. *Guy* is distinguishable because it relies on the factual link rule applied by the Illinois Appellate Court in *Maksimovic,* but which was subsequently overruled by the Illinois Supreme Court in that very case.

The law is now clear that plaintiffs' Hate Crime claim is not preempted by the IHRA.

IT IS THEREFORE ORDERED that defendant's motion for summary judgment [18–1] is denied. The ruling date of August 27, 1998 is vacated. In open court, on September 10, 1998 at 9:15 a.m., the parties shall present an original and one copy of a top-bound, final pretrial order in full compliance with Local Rule 5.00.