In the
United States Court of Appeals
For the Seventh Circuit

No. 99-4166

ELLIS BAGLEY, JR.,

Plaintiff-Appellant,

v.

AMERITECH CORPORATION,
a Delaware corporation,

Defendant-Appellee.


Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 C 1449--Suzanne B. Conlon, Judge.


Argued May 15, 2000--Decided July 17, 2000


Before CUDAHY, FLAUM, and EVANS, Circuit Judges.

EVANS, Circuit Judge.  When the assistant sales manager of an Ameritech retail store told Ellis Bagley, Jr. that she would not serve him, Bagley concluded that no one at the store would sell him a telephone, so he walked out and then filed this race discrimination suit under 42 U.S.C. sec.sec. 1981 and 1982. The district court dismissed the case on summary judgment, finding that Bagley, a black man, never really tried to enter into a contract and thus could not have been denied of his rights to contract or purchase personal property. Bagley appeals this decision. Our review starts with the facts, and as the dismissal came on summary judgment, we present them in the light most favorable to Bagley.

Ellis Bagley, Jr. likes to take a leisurely breakfast. Specifically, the 51-year-old reinsurance intermediary and adjunct professor of law begins each day with a 2-hour stint at the Walker Brothers Original Pancake House in Lincolnshire, Illinois, where he reads several newspapers over coffee and then orders food.
During his daily breakfasts, Bagley came to recognize various members of the wait staff. One of them, Sheila Mauritz-Marrs, earned his enmity when (according to Bagley) he overheard her tell another waitress, "I hate fucking Mexicans." Bagley decided never again to sit in Mauritz-

Marrs' section and thereby denied her the generous tips that he says followed his morning repast. Unfortunately, Bagley's no-contact policy with Mauritz-Marrs did not extend to other retail establishments in the area.

In mid-1997, Mauritz-Marrs started working a second job at Ameritech's retail outlet in the Chicago suburb of Vernon Hills. During her first year's tenure, Bagley shopped there a few times without incident. Then, on April 25, 1998, Bagley says he entered the store seeking to buy a cordless phone he had seen advertised in the local media. Since Ameritech keeps its phones in the back, Bagley couldn't simply grab the model he wanted off the shelf and take it to the cashier. Thus, he walked over to a sales clerk and asked if the phone was still in stock. The clerk, James Hovinen, turned to ask the question of Mauritz-Marrs, who had by then attained the rank of assistant sales manager. According to Bagley, she loudly responded, "I will not serve him." She then gave Bagley the finger, handed Hovinen a brochure about the phone, and walked into her office. Bagley was offended--he thought Mauritz-Marrs treated him in this manner because of his race--so he promptly left the store.

Later that day, Bagley returned to get Hovinen's name so he could use him as a witness. Hovinen provided Bagley with his name and then asked him if he needed any further assistance in making a purchase. Bagley declined the offer. Then, before he left, Bagley says Mauritz-Marrs again gave him the finger./1

Bagley complained to Ameritech, but when this failed to extract anything more than a letter explaining that he had misunderstood Mauritz-Marrs' "friendly banter," he filed suit under 42 U.S.C. sec.sec. 1981 and 1982. As we said, Ameritech moved for summary judgment and the district court granted the motion. The court reasoned that since Bagley could only show that Ameritech interfered with his prospective contractual relations, not with a specific contract that it refused to enter or enforce, neither his right to contract (sec. 1981) nor his right to buy personal property (sec. 1982) was infringed. See, Morris v. Office Max, Inc., 89 F.3d 411 (7th Cir. 1996). In other words, the judge found that because Bagley had not agreed to purchase the phone at the time Mauritz-Marrs told him that she would not serve him, and he did not attempt to buy it after the comment was made, Bagley could not point to a specific contract that Ameritech denied him.

Our decision in Morris and the Sixth Circuit's ruling in Watson v. Fraternal Order of Eagles,

915 F.2d 235 (6th Cir. 1990), establish nice touchstones from which to evaluate the district court's holding. In Morris, two black men filed suit under sec.sec. 1981 and 1982 claiming that when an Office Max employee summoned police officers to the store because they "looked suspicious," the store denied them of their right to "buy whatever the white man can buy." Id. at 412. We held that the store did not deny them of this right since there was no evidence that it refused them admittance or service. Without such evidence, their "prospective contract theory"--a claim that they would have bought a time stamp but for the store's offensive conduct--failed since they neither alleged that they were going to buy the time stamp, nor attempted to buy it. They simply left of their own accord because they were offended.

In Watson, two African-Americans (a mother and son) filed suit under sec. 1981 after they were asked to leave a private party held at a Fraternal Order of Eagles club pursuant to a policy of only serving whites. 915 F.2d 235. The district court granted the Eagles' motion for summary judgment, finding that since the plaintiffs had not ordered drinks before they were asked to leave, they had not attempted to enter into and been refused a contract. Id. In reversing this decision, the Sixth Circuit declared:

The fact that the Watsons were never refused service in this case is not controlling. If they were asked to leave in order to prevent them from purchasing soft drinks, [this] could be found to be merely the method used to refuse to contract. Were it otherwise, commercial establishments could avoid liability merely by refusing minorities entrance to the establishment before they had the chance to order.

Id. at 243.

In our de novo review of the district court's holding, the first (fairly easy) issue is whether the district court correctly found that Ameritech could not have denied Bagley service since he had not specifically stated that he would like to purchase the phone prior to the exchange with Mauritz-Marrs. Bagley's pleadings, which must be taken as true, repeatedly recite that he went to the store solely to buy the phone. If he entered the store for that purpose and was refused service, he has a claim. To hold otherwise would be to side with the district court in Watson (i.e., provided a store instructs employees to tell black customers that it will not serve them before they ask to buy products, it is immune from suit under sec.sec. 1981 and 1982). Since

such a holding is both reprehensible and in no way encouraged by our decision in Morris, to the extent the district court relied on Bagley's failure to specifically state that he would like to purchase the product, it erred.

With this minor issue out of the way, the case boils down to whether Ameritech refused to contract with Bagley (like Watson), or Bagley opted not to contract with Ameritech (like Morris). The district court found that Bagley chose not to enter the contract since: (1) he was allowed into the store; (2) he received assistance from Hovinen; (3) he immediately left the store after hearing the comment without attempting to consummate the transaction with Hovinen or anyone else; (4) no one told him to leave; (5) Hovinen asked him if he needed assistance when he returned that afternoon; (6) Mauritz-Marrs handed Hovinen the brochure despite her comments; and (7) Bagley made a number of past purchases at the store and had twice been helped by Mauritz-Marrs.

Bagley claims that "I will not serve you" + the finger = refusal of service. Unlike the Morris plaintiffs, he asserts that he entered the store for the express purpose of buying the phone and could not complete the transaction because Mauritz-Marrs said she would not serve him. Under both Morris and the plain language of the statute, he believes these facts amply support his claim that he was deprived of his rights to contract and purchase property. See, Morris, 89 F.3d at 414 (stating that the plaintiffs could not show that they were deprived of their rights to contract [and buy property] since "they were [not] denied service").

We disagree. While we do not fault Bagley for taking offense at Mauritz-Marrs' conduct (if, as claimed, it was motivated by racial animus--not "joking around" as she testified), her actions cannot be construed as anything more than a refusal to personally wait on Bagley. She did not say "We will not serve you," nor did she in any way instruct Hovinen to deny Bagley service. Rather, it is clear that when she handed Hovinen the brochure she intended that he would continue to wait on Bagley. Bagley cut off his exchange-- and thus the opportunity to buy the phone--by leaving the store. Further, even if there were any lingering doubt that Mauritz-Marrs' behavior meant something other than that she would not wait on Bagley herself, Hovinen's offer to help Bagley make a purchase upon his return later that day definitively establishes that Ameritech would have sold Bagley a phone.

Since Ameritech was not responsible for

terminating the transaction, it did not violate sec.sec. 1981 and 1982. The district court correctly dismissed Bagley's claims and its judgment is AFFIRMED.


/1 Watching the parties dance around using the term "the finger" has been fairly amusing. While "flipping the bird" might be a tad too informal for a legal brief (see the "New Dictionary of American Slang" by Dr. Robert L. Chapman), there is something to be said for calling a thing by its proper name to avoid confusion. Bagley's brief reports that Mauritz-Marrs "made a gesture with her middle finger"; Ameritech states she "extended her arm while pointing a finger at Bagley." Only in Bagley's deposition do we discover that what sounded like the finger--what had to be the finger--was indeed the finger:

Q: And so what happened next?

A: She went, I will not serve him, with the middle digit pointing at me.

* * *

Q: You said--when you said a middle digit?

A: The middle digit.

Q: You say pointing at you?

A: Pointing at me, sir. Parallel to the ground as opposed to the traditional vertical in a most insulting sign. Traditionally, that is a sign, sir. She pointed her finger at me that way.

Q: So she's saying--her hand was vertical with her middle finger pointing out?

A: Yes, sir. . . . One of the most gross gestures in the world.


 Cudahy, Circuit Judge, concurring in the judgment. I can agree with the result reached by the majority and by the district court, but their respective rationales seem to me unrealistic and possibly dangerous as precedents. I concur in the majority's treatment of the district court's reasoning. But the majority substitutes an analysis that turns on the voluntariness of Bagley's exit from the store rather than on his departure as the inevitable outcome of a refusal

of service by Ameritech. This conclusion posits a fanciful view of human nature. Must Bagley press on in the face of the finger from Ameritech's assistant sales manager or forfeit his rights as a customer? I think not. That kind of treatment, especially by a supervisory employee, seems to me calculated to drive the customer from the premises and realistically amounts to a refusal of service.

The majority also suggests that the transaction could have been completed by Hovinen, whom Mauritz-Marrs allegedly empowered to carry on by handing him the brochure. But the issue whether Hovinen could actually secure the cordless phone and sell it to a customer without assistance from Mauritz-Marrs is unclear from the facts as shown. Therefore, I think it improper to rely on this conjecture as a basis for summary judgment.

On the other hand, there may well not be an adequate showing here of racial animus. Mauritz-Marrs had apparently waited on Bagley in the store on earlier occasions without racial incident. And the display of the finger, though emphatically hostile, does not provide a racial link. The fact that Bagley in another setting may have overheard Mauritz-Marrs demean Mexicans is not an adequate basis for finding anti-black motives in the phone store encounter.

I would, therefore, affirm the summary judgment but on the ground that a racial motive has not been adequately shown.