**Michael O'NEILL, Plaintiff,**

**v.**

**GOURMET SYSTEMS OF MINNESO-TA, INC., d/b/a Applebee's Neighborhood Grill and Bar, and Applebee'S International, Inc., Defendants.**

No. 01–C–401–C.

United States District Court, W.D. Wisconsin.

July 8, 2002.

Peter J. Nickitas, Nickitas Law Office, St. Paul, MN, for Plaintiff, O'Neill, Michael.

James R. Scott, Lindner & Marsack, S.C., Milwaukee, WI, for Defendants, Applebee's International, Inc. Applebee's Neighborhood Grill An Gourmet Systems of, Minnesota, Inc.

## OPINION AND ORDER

CRABB, District Judge.

This is a civil suit for monetary, declaratory and injunctive relief brought pursuant to 42 U.S.C. § 1981; Title II of the Civil Rights Act of 1964, 42 U.S.C. § 2000a; and Wisconsin's public accommodation law, Wis. Stat. § 106.52. Plaintiff Michael O'Neill, a member of the Red Lake Band of Chippewa Indians, contends that defendants Gourmet Systems of Minnesota, Inc. and Applebee's International, Inc. discriminated against him on the basis of his race when a waiter at an Applebee's Neighborhood Grill and Bar franchise in Superior, Wisconsin, refused to accept his tribal identification card as proof that he was old enough to buy alcohol. Presently before the court is defendants' motion for summary judgment, which will be granted as to plaintiff's federal law claims because I conclude that no reasonable jury could find from the undisputed facts that plaintiff has established a prima facie case of intentional or disparate impact discrimination. Because plaintiff has no viable federal law claim, I will not exercise supplemental jurisdiction over his state law claims.

For the purpose of deciding the pending motion, I find from the parties' proposed findings of fact that the following material facts are undisputed.

## UNDISPUTED FACTS

Plaintiff Michael O'Neill is an enrolled member of the Red Lake Band of Chippewa American Indians whose ancestry is one-quarter Chippewa and who at all times relevant to this action was 56 years old. The United States recognizes the Red Lake Band of Chippewa as a sovereign entity. Defendant Gourmet Systems of Minnesota, Inc., is a for-profit corporation with its corporate headquarters in Overland Park, Kansas, and its offices in Minnetonka, Minnesota. Defendant Gourmet Systems owns and operates 45 Applebee's Neighborhood Grill and Bar restaurants in Minnesota and Wisconsin, including the Applebee's restaurant located at 3605 Tower Avenue in Superior, Wisconsin, where the events giving rise to

this action took place. Defendant Applebee's International, Inc., is a Delaware corporation headquartered in Overland Park, Kansas, that contracts with defendant Gourmet Systems, its subsidiary, and allows it to utilize the name "Applebee's Neighborhood Grill and Bar."

Nearly all Applebee's restaurants serve alcoholic beverages. Defendant Gourmet Systems' policy is to require identification from all persons seeking to buy alcohol at its restaurants who appear to be 40 years old or younger. Defendant Applebee's policy is to require identification from all persons ordering alcohol who appear to be 30 years old or younger. It is the policy of both defendant Gourmet Systems and defendant Applebee to accept as proof of age only state driver's licenses, state-issued identification cards, United States military identification cards and passports, provided these documents include a photograph. At each of its restaurants, defendant Gourmet Systems keeps a book of photographs of state driver's licenses and state identification cards for the purpose of verifying the authenticity of the licenses and identification cards presented by its customers. These books do not contain pictures of American Indian tribal identification cards or United States military identification cards.

Defendant Gourmet Systems has been the subject of numerous "sting" operations conducted by local law enforcement agencies in Minnesota in which undercover officers or other individuals under the age of 21 attempt to purchase alcohol at its restaurants. For instance, defendant Gourmet Systems' restaurant in Plymouth, Minnesota, has been fined at least twice and suffered two five-day suspensions of its liquor license as a result of serving alcohol to underage patrons, while its Maple Grove, Minnesota restaurant has been charged with similar violations three times in six years and has incurred a 20–day suspension of its liquor license, leading it to adopt a policy of carding all customers ordering alcohol, regardless of their apparent age. In each of these instances, the employee who served alcohol to an underage patron was fired. In addition, defendant Gourmet Systems uses a private security company to conduct undercover audits of its employees' compliance with its alcohol service guidelines.

Defendant Gourmet Systems opened the Applebee's Neighborhood Grill and Bar in Superior, Wisconsin, on November 13, 2000. Employees of the new restaurant received 10 to 14 days of training before the opening. Throughout the training, employees were constantly reminded of the restaurant's alcohol policies. On November 14, 2000, plaintiff visited the new restaurant with his wife and his son's fiancée with the intention of having lunch. The plaintiff and his party were waited on by Robin Krawza, whose ancestry is one-quarter Blackfoot Indian. Plaintiff ordered a brandy, while his companions ordered coffee. Krawza believed that plaintiff was in his late thirties or early forties and asked to see proof of his age. Plaintiff gave Krawza a tribal identification card from the Red Lake Band of Chippewa Indians that included, among other things, a tribal logo and plaintiff's date of birth, a photograph, name, address, Social Security number, height, weight, hair and eye color. When asked, plaintiff told Krawza he did not have a driver's license or state identification card. Plaintiff does not drive and has no photo identification other than his tribal identification card. Krawza explained that it was company policy to card anyone who appeared to be under 40 and that she would need approval from her manager to accept the tribal identification card. At the time, the restaurant was busy. The manager, Greg Hartnett, looked at the tribal card and told Krawza that it was not an acceptable form of iden-

tification. Krawza then returned to the table and told plaintiff that she could not accept his tribal identification card and, therefore, could not serve him brandy. This caused plaintiff and his party severe embarrassment. At this point, plaintiff and his party left the restaurant and went to a nearby restaurant where plaintiff was served two brandies without having to show identification.

On November 16, 2000, plaintiff filed a discrimination complaint with the state of Wisconsin. On April 4, 2001, the Wisconsin Department of Workforce Development, Equal Rights Division, made an initial determination of "probable cause to believe Applebee's International, Inc. d/b/a Applebee's Neighborhood Grill and Bar violated the Wisconsin Public Accommodations and Amusements Law" by "denying the full and equal enjoyment of a public place of accommodation or amusement because of race ... [or] ancestry." Plaintiff withdrew his complaint and request for a hearing, in accordance with Department of Workforce Development rules, in order to bring this lawsuit.

## OPINION

Plaintiff contends that he was the victim of intentional discrimination in violation of 42 U.S.C. § 1981; Title II of the Civil Rights Act of 1964, 42 U.S.C.2000a and 2000a–1; and Wisconsin's public accommodation law, Wis. Stat. § 106.52(3)(a)1. In addition, plaintiff contends that defendants' alcohol identification policy has a racially disparate impact on American Indians in violation of Title II and Wisconsin's public accommodation law.

### A. *Federal Law Claims for Intentional Discrimination*

1. *42 U.S.C. § 1981*

42 U.S.C. § 1981 guarantees that "[a]ll persons within the jurisdiction of the United States shall have the same right ... to make and enforce contracts ... as is en-joyed by white citizens." 42 U.S.C. § 1981(a). Under § 1981, the term "make and enforce contracts" includes "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." § 1981(b). Typically, § 1981 litigation involves employment contracts. Claims involving retail transactions are less frequent, but courts have had to address § 1981 claims based on the denial of the right to contract for food and beverages in restaurants. *See, e.g., Callwood v. Dave & Buster's, Inc.,* 98 F.Supp.2d 694 (D.Md. 2000); *Laroche v. Denny's Inc.,* 62 F.Supp.2d 1375 (S.D.Fla.1999); *Wells v. Burger King Corp.,* 40 F.Supp.2d 1366 (N.D.Fla.1998); *McCaleb v. Pizza Hut of America, Inc.,* 28 F.Supp.2d 1043 (N.D.Ill. 1998). The law in this area remains somewhat unsettled.

The Court of Appeals for the Seventh Circuit has held that in the retail context, "[t]o establish a claim under § 1981, the plaintiffs must show that (1) they are members of a racial minority; (2) the defendant had an intent to discriminate on the basis of race; and (3) the discrimination concerned one or more of the activities enumerated in the statute (i.e., the making and enforcing of a contract)." *Morris v. Office Max, Inc.,* 89 F.3d 411, 413–14 (7th Cir.1996) (citations omitted). For the purpose of their motion for summary judgment, defendants concede that plaintiff is a member of a racial minority, satisfying the first prong of this test. However, defendants argue that plaintiff cannot satisfy the second and third prongs because defendants did not engage in intentional discrimination and because plaintiff was not denied the opportunity to contract for food or beverages at the Superior Applebee's, with the exception of alcohol.

■ Taking the latter argument first, I conclude that plaintiff was denied the opportunity to make a contract within the meaning of § 1981 because he was denied "all [the] benefits, privileges, terms, and conditions of the contractual relationship" into which he entered. § 1981(b). Section 1981 "provides protection against discriminatory conduct occurring during and after the formation of a contract." "In the restaurant context, [it] has been read to protect against the discriminatory denial of 'the accouterments that are ordinarily provided with a restaurant meal....'" *Callwood*, 98 F.Supp.2d at 703 (citing *McCaleb*, 28 F.Supp.2d at 1048). In *McCaleb*, the court concluded that even though the plaintiffs were served pizza and permitted to eat it in the restaurant, the defendant "refused to make a contract with plaintiffs in that defendant refused to sell them drinks that they expressed an interest in purchasing" thus providing plaintiffs with "less than the full value of their purchase." In this case, plaintiff ordered a brandy and his companions ordered coffee. Although plaintiff's waitress agreed to serve the group coffee, she refused to serve him alcohol, an "accouterment" of a meal typically available to a 56–year–old patron of a grill and bar.

Defendants cite *Bagley v. Ameritech Corp.*, 220 F.3d 518 (7th Cir.2000), for the proposition that plaintiff was not denied the opportunity to enter into a contract within the meaning of § 1981, but that case is distinguishable. In *Bagley*, the plaintiff, an African–American man, sought to purchase a phone at an Ameritech store. When the salesperson helping the plaintiff asked the store's manager whether the phone was in stock, the manager replied, " 'I will not serve him' [and] then gave [the plaintiff] the finger, handed [the salesperson] a brochure about the phone, and walked into her office." *Id.* at 520. The plaintiff left the store immediately, but returned later the same day to obtain the salesperson's name so he could use him as a witness. At that time, the salesperson offered again to assist the plaintiff with any purchase he wished to make, but the plaintiff declined. The court of appeals held that the manager's actions could not "be construed as anything more than a refusal to *personally* wait on [the plaintiff]" and that the plaintiff had "cut off his exchange [with the salesperson]—and thus the opportunity to buy the phone—by leaving the store." *Id.* at 521 (emphasis added). The rationale in *Bagley* (deemed "unrealistic and possibly dangerous as precedent" by a concurring judge) does not control this case. Plaintiff was refused alcohol by both his waitress and the restaurant's manager. Unlike the plaintiff in *Bagley*, plaintiff could not seek out a different salesperson in the hopes of obtaining the drink he ordered.

■ Having satisfied two of the three prongs identified in *Morris*, 89 F.3d 411, plaintiff must now show that "an intent to discriminate on the basis of race" was a factor in his inability to order alcohol at the Superior Applebee's. *Id.* at 413. Plaintiff does not allege that Robin Krawza refused to serve him brandy as a result of personal racial animus. According to plaintiff, Krawza "refused to serve [him] his brandy solely because she followed pre-existing corporate orders, handed down to her by the restaurant general manager ... to dishonor [plaintiff's] Tribal ID because it was not on Applebee's 'approved' list.... She just carried out a corporate decision." Plt.'s Br. in Opp'n to Dfts.' Mot. for Summ. J., dkt. # 30, at 26. Plaintiff does not argue that the restaurant's general manager refused to accept his tribal identification card for any reason other than defendants' corporate policy. This case, then, is unlike the majority of § 1981 retail cases in which wait staff or service personnel are accused of racial

harassment and bias. Instead, to the extent plaintiff alleges intentional discrimination at all, his allegation is that defendants adopted a corporate alcohol identification policy with the intent of discriminating against American Indians. *See id.* at 20 (arguing that "[t]he Defendants' policies perpetuate the stereotype of the 'drunken Indian who cannot take care of himself'" and that "[t]he court should find the Defendants' policies which refuse to recognize [plaintiff's] ... Tribal ID to be facially, racially discriminatory").

Two consequences flow from plaintiff's approach. First, it renders irrelevant plaintiff's proposed findings of fact that some white patrons of various Applebee's restaurants were not asked for identification when ordering alcohol, even though they were younger than plaintiff. This is because plaintiff has challenged defendants' corporate policy regarding acceptable forms of identification, rather than the individual decisions made by wait staff to ask for identification from customers ordering alcohol. Second, to defeat defendants' summary judgment motion on his intentional discrimination claims, plaintiff must adduce at least some evidence that defendants' policy was instituted with an eye towards discouraging American Indian customers from purchasing alcohol.

"It is well-settled that there exist two methods of approaching ... [a] § 1981 claim[ ]. Under the first, a plaintiff can offer direct proof of discriminatory intent to meet his burden of proof." *Oates v. Discovery Zone,* 116 F.3d 1161, 1169 (7th Cir.1997) (citation omitted). Plaintiff has offered no direct evidence that defendants' alcohol identification policy is intended to discriminate against American Indians. "Alternatively, the indirect, or burden-shifting approach, originally espoused in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), requires a plaintiff to initially establish, by a preponderance of evidence, a prima facie case of racial discrimination." *Id.* at 1170. In response, the burden of production shifts to the defendant, who must articulate a legitimate, non-discriminatory reason for its actions. *Id.* If the defendant meets this burden, "[t]he plaintiff then must prove by a preponderance of the evidence that 'the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" *Id.* (citations omitted).

Because plaintiff has presented no direct evidence of intentional discrimination, he must proceed under the *McDonnell Douglas* burden-shifting approach by first establishing a prima facie case of racial discrimination. The law is unclear regarding the elements of a prima facie case under the burden-shifting framework in a § 1981 retail transaction case. Some courts have adopted the *Morris* three-part test, described above, as the measuring stick for determining whether a plaintiff has established a prima facie case within the burden-shifting framework. *See, e.g., Hampton v. Dillard Dept. Stores, Inc.,* 247 F.3d 1091, 1101–02 (10th Cir.2001); *Bobbitt v. Rage, Inc.,* 19 F.Supp.2d 512, 517 (W.D.N.C.1998). It is possible that the three-part standard articulated in *Morris,* 89 F.3d at 413, establishes the elements that a plaintiff must make out to satisfy the initial prima facie case requirement under the burden-shifting approach in the Seventh Circuit. Possible, but not certain. *See Christian v. Wal–Mart Stores, Inc.,* 252 F.3d 862, 868 n. 4 (6th Cir.2001) ("Notably, the ... Seventh Circuit did not characterize [the test in *Morris* ] as a prima facie test. Instead, [it] noted generally that a plaintiff must prove these three elements to prevail under § 1981."); *Callwood,* 98 F.Supp.2d at 705 ("In *Morris* ... the court nowhere mentions the term 'prima facie case.' It is plain that the court is describing the elements of a section 1981

*claim,* not the elements of a *prima facie case.*").

Indeed, the *Morris* test has a serious drawback when used as the prima facie case requirement in the burden-shifting framework because the second prong of that test requires a plaintiff to show that "the defendant has an intent to discriminate on the basis of race." 89 F.3d at 413. As the Court of Appeals for the Sixth Circuit has noted, "[c]learly, a plaintiff asserting a § 1981 claim must prove intentional discrimination ... [b]ut it does not follow that the plaintiff must prove intentional discrimination as an element of the prima facie case." *Christian,* 252 F.3d at 870 (citations omitted). Adopting an argument first articulated in *Callwood,* 98 F.Supp.2d at 705, the Court of Appeals for the Sixth Circuit observed that the *Morris* test would

> erroneously collapse[ ] the overall elements of a section 1981 claim with the elements of a prima facie case. In particular, to the extent that any formulation of the elements of a prima facie case includes a requirement that the plaintiff show that the defendant had an intent to discriminate on the basis of race, such a formulation is inappropriate because the very point of the prima facie case requirement is to provide a basis for inferring the existence of a discriminatory motive.

*Christian,* 252 F.3d at 870 (citing *Callwood,* 98 F.Supp.2d at 705). The court's position is persuasive. Accordingly, I conclude that although *Morris* establishes the three elements that a plaintiff must prove ultimately in order to succeed in a § 1981 retail transaction case, it does not lay out the relevant elements for establishing a prima facie case within the *McDonnell Douglas* burden-shifting framework. Indeed, refusing to saddle a plaintiff with a requirement that he show intentional discrimination as part of his prima facie case

comports with the Supreme Court's understanding that "[t]he burden of establishing a prima facie case of disparate treatment is not onerous." *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

Given this conclusion, it is necessary to identify the elements of a prima facie case in the retail transaction context. "[T]he precise requirements of a prima facie case can vary depending on the context and were 'never intended to be rigid, mechanized, or ritualistic.'" *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 997, 152 L.Ed.2d 1 (2002) (quoting *Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978)). In *Oates,* 116 F.3d at 1171, an employment discrimination case, the Court of Appeals for the Seventh Circuit noted that "to establish a prima facie case of discriminatory discharge, [a plaintiff] must show that: (1) he is a member of a protected class; (2) he performed his job satisfactorily; (3) he suffered an adverse employment decision; and (4) [his employer] treated similarly-situated employees outside his classification more favorably." At least one district court in the Seventh Circuit has used a slightly modified version of these elements as the prima facie requirements in a § 1981 retail transaction case. *Huggar v. Northwest Airlines, Inc.,* No. 98–C–594, 1999 WL 59841, at *4 (N.D.Ill. Jan 27, 1999). In *Huggar,* an airline passenger sued his carrier under § 1981 for allegedly discriminatory treatment he endured during a flight. Noting that it was modifying the *Oates* standard slightly because it was not dealing with an employment case, the district court observed that "[t]o establish a prima facie case of race discrimination for disparate treatment, Huggar must show: (1) he is a member of a protected class; (2) his actions were satisfactory; (3) he suffered a materially adverse action; and (4) similarly situated non-protected in-

dividuals were treated more favorably." *Id.*

In contrast, the courts in *Christian* and *Callwood* considered and rejected the use in the retail transaction context of prima facie elements lifted essentially unchanged from the employment context. In particular, these courts found the fourth prong troublesome because unlike employment decisions, which "by and large are regularized and periodic" and are "almost always documented, and thus preserved for sober examination," the retail environment involves "interactions of a highly mobile public with hostesses, waitpersons and managers" that are "almost never documented in any meaningful sense." *Callwood*, 98 F.Supp.2d at 706. Therefore, in the retail context, "the task of producing similarly situated persons outside the protected group is much more difficult" than it is in the employment context. *Christian*, 252 F.3d at 871. These concerns are equally compelling in the instant case. Although plaintiff is challenging a corporate policy, rather than the treatment he received from wait staff, it would be difficult for him to establish as part of his prima facie that similarly-situated white customers were treated more favorably than he was when ordering alcohol. Plaintiff would be forced to uncover incidents in which white customers were served alcohol although they could not show one of the identification documents on defendants' approved list. Although it is not an impossible requirement to meet, it would be onerous.

■ In order to address such concerns, the *Christian* and *Callwood* courts adopted the following test for establishing a prima facie case of discrimination in the retail or commercial context:

(1) the plaintiff is a member of a protected class;

(2) the plaintiff made himself available to receive and pay for services ordinarily provided by the defendant to all members of the public in the manner in which they are ordinarily provided; and

(3) the plaintiff did not enjoy the privileges and benefits of the contracted for experience under factual circumstances which rationally support an inference of unlawful discrimination in that

(a) the plaintiff was deprived of services while similarly situated persons outside the protected class were not deprived of those services, and/or

(b) the plaintiff received services in a markedly hostile manner and in a manner which a reasonable person would find objectively unreasonable.

*Id.* at 871; *Callwood*, 98 F.Supp.2d at 707. In particular, "[s]ubpart 3(b) is written as an alternative to 3(a) to account for situations in the commercial establishment context in which a plaintiff cannot identify other similarly situated persons." *Christian*, 252 F.3d at 871. Because plaintiff in this case is not complaining of hostile treatment from a particular restaurant server or manager, subpart 3(b)'s "markedly hostile manner" formulation may appear inapt for purposes of challenging a uniform corporate policy. However, this concern is unwarranted because "[f]actors relevant to subpart 3(b)'s 'markedly hostile' component include whether the conduct 'is (1) so profoundly contrary to the manifest financial interests of the merchant and/or her employees'; (2) so far outside of widely-accepted business norms; and (3) so arbitrary on its face, that the conduct supports a rational inference of discrimination." *Id.* (quoting *Callwood*, 98 F.Supp.2d at 708). These factors are as well-suited to analyzing a restaurant's adoption of a uniform alcohol policy as they are to examining individual interactions between retail staff and their customers.

■ With the elements of a prima facie case established, it remains to apply them

to the undisputed facts of this case. Even assuming plaintiff can establish the first two elements of his prima facie case, I find that no reasonable jury could conclude that he has met his production burden under the third element. As to subpart 3(a), had plaintiff provided evidence that customers outside the protected class were routinely allowed to use identification not on defendants' approved list, it might be possible to draw the inference that the policy was a mere pretext or was understood to apply only to American Indians. However, plaintiff has produced no evidence to that effect.

■ Turning to subpart 3(b), I must consider whether defendants' policy is so profoundly contrary to their manifest financial interests, so far outside of widely-accepted business norms or so arbitrary on its face that the policy's adoption supports a rational inference of discrimination. Plaintiff has offered no evidence that the alcohol identification policy is profoundly contrary to defendants' financial interests or that it is facially arbitrary. On the contrary, the undisputed facts show that defendant Gourmet Systems' restaurants have been targeted in the past by local law enforcement agencies that have uncovered sales of alcohol to underage patrons, some of defendants' restaurants have been fined and have had their liquor licenses suspended. These facts suggest that defendants' alcohol identification policy does not undermine defendants' financial interests but advances them by seeking to limit fines and liquor license suspensions that could seriously affect the viability of an establishment that bills itself as a neighborhood grill and *bar*. In addition, no reasonable jury could conclude that defendants' policy is arbitrary because plaintiff has introduced no evidence to that effect by, for instance, showing that other restaurants or bars routinely accept American Indian tribal identification cards as proof of age for purposes of purchasing alcohol.

The only evidence plaintiff offers to suggest that defendants' policy is arbitrary or a significant deviation from accepted business norms is his observation that the federal government deems some Native American tribal documents acceptable for purposes of demonstrating employment eligibility under the Immigration and Nationality Act. From this, plaintiff argues that his "Tribal ID is legitimate under federal law for the highly regulated purpose of establishing employment identity and eligibility" and that if the tribal identification card is "good enough to ward off prosecution for hiring undocumented workers, it should be good enough for serving drinks." Plt.'s Br. in Opp'n to Dfts.' Mot. for Summ. J., dkt. # 30, at 24. As an initial matter, this assertion is flawed. By themselves, "Native American tribal documents," are not sufficient to establish both identity and employment eligibility under the Act. *See* 8 C.F.R. § 274a.2(b)(1)(v). They may be used to establish one or the other, but not both. Therefore, plaintiff is wrong when he asserts that his tribal identification card can get him a job but not a drink at Applebee's. His argument has a more fundamental flaw. In the absence of additional evidence no reasonable jury could conclude that because the federal government accepts Native American tribal documents for some purposes, defendants' refusal to accept them as proof of age for purposes of buying alcohol is "far outside widely-accepted business norms." *Christian*, 252 F.3d at 871.

Plaintiff has failed to establish a prima facie case of intentional discrimination. I will grant defendants' motion for summary judgment on plaintiff's 42 U.S.C. § 1981 claim.

2. *Title II, 42 U.S.C. § 2000a*

■ "The purpose of Title II is to eliminate 'the daily affront and humiliation.

involved in discriminatory denials of access to facilities ostensibly open to the general public.'" *E.E.O.C. v. Chicago Club*, 86 F.3d 1423, 1434 (7th Cir.1996) (citation omitted). The statute insures that "[a]ll persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation ... without discrimination or segregation on the ground of race, color, religion or national origin." 42 U.S.C. § 2000a(a). Restaurants are places of public accommodation under the statute. § 2000a(b)(2). The *McDonnell Douglas* burden-shifting analysis applies to Title II public accommodation cases. *Hornick v. Noyes*, 708 F.2d 321, 325 n. 8 (7th Cir. 1983). Because I have concluded that plaintiff has failed to establish a prima facie case of discrimination under the burden-shifting framework for his § 1981 claim, his Title II intentional discrimination claim must fail as well. Defendants' motion for summary judgment as to this claim will be granted.

### B. *Federal Law Disparate Impact Claim*

Plaintiff contends that defendants' alcohol identification policy has a racially disparate impact on American Indians in violation of Title II of the Civil Rights Act of 1964. It is unclear whether disparate impact claims are cognizable under Title II. *See Arguello v. Conoco, Inc.*, 207 F.3d 803, 813 (5th Cir.2000); *Akiyama v. United States Judo, Inc.*, 181 F.Supp.2d 1179, 1184 (W.D.Wash.2002). However, because plaintiff has produced no evidence suggesting that defendants' policy has a racially disparate impact on American Indians, I need not decide whether Title II is amenable to a disparate impact theory.

 To succeed on his disparate impact claim, plaintiff must first make out a prima facie case by showing that defen-

dants' policy has an adverse impact on minorities. *Price v. City of Chicago*, 251 F.3d 656, 659 (7th Cir.2001) (Title VII case). A plaintiff who makes "no attempt to demonstrate, through statistics or otherwise, that [the challenged] practice has a disparate impact on minorities" fails to make out a prima facie case. *Id.* at 661; *see also Pfaff v. United States Dept. of Housing and Urban Development*, 88 F.3d 739, 745 (9th Cir.1996) (prima facie case requires showing of "significantly adverse or disproportionate impact" on protected class) (citation omitted). Plaintiff has provided no evidence from which a jury could infer that American Indians are affected disproportionately by defendants' policy because they are, for instance, statistically less likely than other groups to possess a driver's license, state-issued identification card, United States military identification card or passport. With no evidence of disparate impact, plaintiff cannot make out his prima facie case. Accordingly, defendants' motion for summary judgment on this claim will be granted.

### C. *State Law Claims*

Plaintiff contends that defendants' policy violates Wisconsin's public accommodation law. Wis. Stat. § 106.52(3)(a)1. Because I am granting defendants' motion for summary judgment as to all of plaintiff's federal law claims, I decline to exercise jurisdiction over his state law claims. *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 500 (7th Cir.1999) (district court has discretion to retain or to refuse jurisdiction over state law claims).

### ORDER

IT IS ORDERED that

1. The motion for summary judgment of defendants Gourmet Systems of Minnesota, Inc. and Applebee's International,

Inc. is GRANTED with respect to plaintiff's federal law claims;

2. I decline to exercise supplemental jurisdiction over plaintiff's state law claims; and

3. The clerk of court is directed to enter judgment for defendants and close this case.